LESTER JONES,      :
    Plaintiff,     :
           :
    v.       :  C.A. No. 14-030M
           :
CAROLYN W. COLVIN, ACTING  :
COMMISSIONER OF SOCIAL SECURITY, :
    Defendant.    :

**REPORT AND RECOMMENDATION**

Patricia A. Sullivan, United States Magistrate Judge

   Since his release from prison after his second felony conviction, Plaintiff Lester Jones has

isolated himself in his room to avoid the auditory hallucinations and debilitating panic attacks

that plague his attempts to engage even in the benign activities urged by his medical providers.

Based on clinical observations made during a treating relationship in 2011 and 2012, his

psychiatrist diagnosed personality disorder with borderline features, in addition to a long-

standing diagnosis of major depressive disorder with psychotic features.  Focusing on the

functional impact of these impairments, Plaintiff comes to this Court seeking reversal of the

decision of the Commissioner of Social Security (the "Commissioner"), denying Disability

Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under §§ 205(g) and

1631(c)(3) of the Social Security Act, 42 U.S.C. §§ 405(g), 1383(c)(3) (the "Act").  He contends

that the Administrative Law Judge ("ALJ") violated 20 C.F.R. § 404.1527[1] in failing to set forth

good reasons for rejecting his treating psychiatrist's opinion, in failing even to consider the

diagnosis of personality disorder, and in failing to obtain medical expert testimony regarding

---

[1] The Social Security Administration has promulgated identical sets of regulations governing eligibility for DIB and SSI.  See McDonald v. Sec'y of Health & Human Servs., 795 F.2d 1118, 1120 n.1 (1st Cir. 1986).  For simplicity, I cite only to the DIB regulations.  See id.

whether his mental impairments equal the severity of a listed impairment. Defendant Carolyn W. Colvin has filed a motion for an order affirming the Commissioner's decision.

The matter has been referred to me pursuant to 28 U.S.C. § 636(b)(1)(B). I find that the ALJ's decision is marred by multiple errors. Accordingly, I recommend that Plaintiff's Motion to Reverse Without or, Alternatively, With a Remand for a Rehearing of the Commissioner's Final Decision (ECF No. 7) be GRANTED, that the Defendant's Motion for an Order Affirming the Decision of the Commissioner (ECF No. 10) be DENIED, that final judgment enter in favor of Plaintiff and that the case be remanded for further proceedings consistent with this opinion.

## I.  Background Facts

Plaintiff Lester Jones was born in 1977. Tr. 182. He attended school through eighth grade, but dropped out during ninth because he was "kicked out" of school and because the work was "[t]oo hard." Tr. 43-44. At twenty-one, he was convicted of robbery and served almost three years in prison. Tr. 45. After he was released in February 2001, he worked seasonally as a laborer in an industrial marine shop and as a night club bouncer. Tr. 49-50. In June 2008, he was arrested again, this time for sexual assault of a minor he met on the internet. Tr. 51, 392. The commencement of the incarceration for sexual assault – June 2008 – also marks the onset of his alleged disability. He completed the sentence in December 2010; since his release, he has lived in a bedroom in his mother's apartment rarely leaving except for legal obligations, medical appointments and occasionally to go to church. Tr. 41, 44-45, 57, 225. He is on probation through 2028 and required to register as a level III sex offender. Tr. 290, 346.

### A.  Plaintiff's Physical Health

For a "younger" person, Tr. 27, Plaintiff's medical health is poor: he has struggled with hypertension and high cholesterol with mixed results from medication. See, e.g., Tr. 327

("persistently elevated BP despite being on HCTZ therapy"). In December 2011, at the age of thirty-four, he suffered a mild stroke. Tr. 426. While he seems to have made a complete recovery neurologically, his psychiatrist opined that the stroke "might have further worsened his mood regulation, insight." Tr. 507. He is overweight though the record does not reveal whether he is obese, which would trigger the inquiry required by Social Security Ruling, SSR 00-3p, Evaluation of Obesity, 65 Fed. Reg. 31039-01 (May 15, 2000). Plaintiff has not challenged the ALJ's finding that none of these conditions is severe or renders him disabled. Tr. 21. They will not be further discussed in this report and recommendation, except to the extent that the December 2011 stroke represents a change adversely affecting Plaintiff's mood disorder.

## B. Plaintiff's Mental Health

Based on what has been collected for this record, Plaintiff's mental health history begins in November 2009, during his second incarceration, when a psychiatrist performed an initial evaluation and diagnosed post-traumatic stress disorder ("PTSD") and depression, with severe stressors relating to the "legal system/crime." Tr. 419. The evaluation states that "[p]ertinent negatives include compulsive thoughts or behaviors, diminished interest or pleasure, feelings of guilt or worthlessness, hallucinations, manic episodes, panic attacks, restlessness or sluggishness or thoughts of death or suicide." Tr. 417. He was assigned a Global Assessment of Functioning ("GAF") [2] score of 50. Tr. 418. In July 2010, a prison psychologist saw him for intermittent

---

[2] The Global Assessment of Functioning ("GAF") scores relevant to this case are as follows:
- 31 – 40, indicating "major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood;"
- 41 – 50, indicating "serious impairment in social, occupational, or school functioning;" and
- 51 – 60, indicating "moderate difficulty in social, occupational, or school functioning."

See Diagnostic and Statistical Manual of Mental Disorders, Text Revision 32–34 (4th ed. 2000) ("DSM–IV–TR"). While use of GAF scores was commonplace at the time of Plaintiff's treatment, "[i]t bears noting that a recent [2013] update of the DSM eliminated the GAF scale because of 'its conceptual lack of clarity . . . and questionable psychometrics in routine practice.'" Santiago v. Comm'r of Soc. Sec., No. 1:13-CV-01216, 2014 WL 903115, at *5 n.6 (N.D. Ohio Mar. 7, 2014) (citing Diagnostic and Statistical Manual of Mental Disorders at 16 (5th ed. 2013) ("DSM–V")). In response, the Social Security Administration ("SSA") released an Administrative Message (AM–

panic attacks, performed a mental status examination and prescribed medication. Tr. 268-69. The prison record reflects observations of flat affect, withdrawn behavior, panic attacks and anxiety, as well as a history of suicidality, with two overdoses and a 1996 psychiatric hospitalization at Butler Hospital. Tr. 265-66. In December 2010, he was released and moved into a bedroom in his mother's apartment. Tr. 41, 45.

In March 2011, Plaintiff ran out of the psychiatric medications he had been provided on release from prison. Tr. 303. He ended up at the Rhode Island Hospital emergency room and was hospitalized at SSTAR of RI for three days (March 18-21, 2011) due to suicidal ideation, hearing voices and increased depression and anxiety; his symptoms included panic attacks, crying for no reason, self-isolation (leaving his home only when necessary) and feelings of uselessness and unworthiness. Tr. 303, 305, 315. At intake, his GAF was assessed at 35. Tr. 306. At discharge, his GAF increased to 50 and he was referred to the Providence Center to continue mental health treatment. Tr. 315-17. In addition to psychiatric symptoms, Plaintiff had abdominal pain and nausea that "seems to get worse when he knows he has to leave house;" the examining physician opined that the cause is "more psychiatric in nature." Tr. 335-36.

In April 2011, Plaintiff was seen at the Providence Center for an initial assessment. Tr. 403. The intake notes prepared by a licensed social worker indicate that he continued to have nightmares, low motivation, panic symptoms and anxiety (causing severe nausea); his diagnoses included "r/o[3] Antisocial PD (personality disorder)," in addition to "Depressive Dis., NOS, r/o

13066, July 22, 2013) to guide "State and Federal adjudicators . . . on how to consider . . . GAF ratings when assessing disability claims involving mental disorders;" it makes clear that adjudicators may continue to receive and consider GAF scores. See Phan v. Colvin, No. CA 13-650L, 2014 WL 5847557, at *2 n.3 (D.R.I. Nov. 12, 2014).

[3] The acronym "r/o" in these diagnoses refers to "rule out," a common phrase used in health care to mean that there is evidence that the patient appears to meet the criteria for a diagnosis, but more information is needed to make a definitive diagnosis. See Pagan v. Colvin, No. 13-CV-30027-MAP, 2014 WL 1281457, at *1 n.2 (D. Mass. Mar. 26, 2014); Morin v. Colvin, No. 13-CV-220-LM, 2014 WL 268721, at *2 n.3 (D.N.H. Jan. 23, 2014) (citing United States v. Grape, 549 F.3d 591, 593 n.2 (3d Cir. 2008)). According to DSM-IV, which was in effect during the

Mood Dis. NOS, Anxiety Dis. NOS," with a GAF of 52. Tr. 403-04, 408. On April 26, 2011, Plaintiff had his first appointment with Providence Center psychiatrist Dr. Omer Cermik and, on May 24, 2011, he started counseling with Providence Center therapist Paul Deffely, LMFT.[4] Tr. 395, 398-99. On May 25, 2011, another Providence Center psychiatrist repeated the baseline mental status examination – he diagnosed depression, anxiety and panic episodes, chronic sleeping problems, voices and chronic suicidal ideation and assessed a GAF of 49. Tr. 392-93.

By the end of June 2011, Plaintiff was having regular appointments with Dr. Cermik, who performed a mental status examination at each encounter. See, e.g., Tr. 346-47, 378-79. Over the course of 2011, Dr. Cermik saw him five times. His notes reflect that Plaintiff did not leave his room and that, although Plaintiff was compliant, medication was "only partially helpful;" despite medication changes, "[n]othing has changed for the better." Tr. 346. Based on a mental status examination performed on December 30, 2011, Dr. Cermik noted that Plaintiff's dysphoric and irritable mood continued and, although overt psychosis was absent and the voices had subsided, suicidal ideation persisted; he recorded a GAF of 45 and diagnosed recurrent major depressive disorder, rule out panic disorder, rule out borderline intellectual functioning and rule out personality disorder. Tr. 347. On December 6, 2011, Plaintiff had a mild stroke.

relevant period of Plaintiff's treatment, personality disorders are classified as Axis II diagnoses. DSM-IV-TR at 29. Because the diagnostic criteria for Axis II diagnoses require an abnormal pattern of behavior that is stable over time, a "rule out" or "deferred" diagnosis may be recorded pending the gathering of additional information and observation sufficient to make a confirmed diagnosis. Cf. Welsh v. Colvin, No. CV-13-0280-FVS, 2014 WL 4113116, at *9 n.2 (E.D. Wash. Aug. 20, 2014); Smith v. Colvin, No. 4:12-CV-237-D, 2013 WL 6247216, at *7 (E.D.N.C. Oct. 11, 2013); DSM-IV-TR at 686.

[4] The Providence Center also provided substance abuse treatment to Plaintiff – the focus of this treatment was on maintaining sobriety in light of past cannabis abuse. There is no suggestion of any substance abuse during the relevant period. See, e.g., Tr. 383. With no substance abuse relapses, the substance abuse therapist, Linda Guzman, LCDP, noted that Plaintiff is "stable." Tr. 358, 370-71. Ms. Guzman's notes have several references to activities that appear nowhere else in the record. For example, she wrote that "Client . . . is attending bible studies," Tr. 466, yet there is no other reference to bible study. In therapy notes, Mr. Deffely refers repeatedly to Plaintiff's struggle to attend church but never bible study. Tr. 486. When the ALJ asked Plaintiff about bible study, he denied that he had ever gone. Tr. 58.

Tr. 426. Preceded by a headache, it occurred at Rhode Island Hospital; the discharge notes link it to Plaintiff's under-controlled hypertension and dyslipidemia. Tr. 426-27. By the morning after the stroke, he was neurologically back to baseline. Tr. 427-28. However, Dr. Cermik opined that the stroke "might have further worsened his mood regulation." Tr. 507.

After the stroke, Plaintiff continued treatment with Dr. Cermik. During 2012, he saw Dr. Cermik regularly at least through October.[5] Tr. 507. As during 2011, at every appointment, Dr. Cermik performed a mental status examination; each records that Plaintiff's GAF persisted at 45. Tr. 462, 475, 494. At the April and June appointments, Dr. Cermik noted that Plaintiff had started the "in-shape" program at the Providence Center and was considering classes at a community college; however, he also observed unhappiness, no smiles, no change in life situation and no conversation or elaboration. Tr. 462, 475. By the August appointment, Plaintiff was "very sad" and crying; both the "in-shape" program and the plan to take courses had failed, although medication appeared to control Plaintiff's most severe symptoms (suicidal ideation and voices). Tr. 494. His isolation in his room continued; once his mother took him to see a relative but he was very anxious. Id. Significantly, in August 2012, Dr. Cermik's treating notes reflect that his prior diagnosis of "R/O [rule out] Personality Disorder" ripened to "Personality Disorder NOS with borderline features." Id.

Throughout the same period, Plaintiff also treated regularly with Mr. Paul Deffely, a mental health therapist at the Providence Center who worked closely with Dr. Cermik. Mr. Deffely's notes are detailed; they reflect Plaintiff's persistent fear of leaving home and the loud voices that make him believe he is going to be attacked so that just riding the bus brings on anxiety and panic attacks that are frequent and severe. Tr. 352. Even during therapy appointments, Mr. Deffely observed that imagined distractions (for example, an imagined phone

---

[5] In October 2012, the record ends; Dr. Cermik may well have continued as Plaintiff's treating psychiatrist.

call) caused confusion.  Tr. 362, 364, 391.  "[A]uditory hallucinations . . . afflict him with noise, volume and non-stop harassment.  He tried to shut them up, but can not."  Tr. 368.  Mr. Deffely repeatedly recorded his observation of Plaintiff's mind "skipping about," resulting in extreme difficulty in sustaining attention during appointments: "[h]e repeatedly dissociates and misses what I am saying."  Tr. 364-66, 374, 449, 458.  When another client was loud enough to be audible, Plaintiff became so upset and distracted that Mr. Deffely had to end the meeting.  Tr. 380.  While Plaintiff derived pleasure from seeing his daughter and taking her to church, the visits also triggered memories of "horrors" from his own childhood, resulting in suicidal ideation during her visits and while at church.  Tr. 445, 448, 486, 488.  When Plaintiff experienced two panic attacks, the second "quite debilitating," at the Providence Center's "in-shape" program, Mr. Deffely became involved and alerted Dr. Cermik.  Tr. 468.  In August 2012, Plaintiff's cousin visited, but Plaintiff was too fearful to see him.  Tr. 492.  His cousin's death soon after triggered frightening hallucinations of objects and shadows in his peripheral vision.  Tr. 497.

### C.  Opinion Evidence

#### 1.  Agency Opinions

Shortly after Plaintiff was released from prison, he applied for DIB and SSI on January 6, 2011.  Tr. 80, 90.  In connection with his applications, in February 2011, Plaintiff underwent a consultative psychological evaluation conducted by state agency psychologist, Dr. John Parsons, who diagnosed PTSD, major depressive disorder, physical and sexual abuse of a child as a victim, sexual abuse of a child and mood disorder.  Tr. 288-96.  During the mental status examination, Dr. Parsons observed lethargy, profound and severely escalating depression, anxiety and difficulty focusing, impaired attention and concentration, persistent suicidal ideation, blunt affect and low average range of general intelligence.  Tr. 293-95.  Plaintiff displayed no

sense of humor and appeared sad and withdrawn, but was cooperative with testing. Tr. 289. Dr.
Parsons recommended a psychiatric evaluation, opined that Plaintiff's prognosis with treatment
was at best fair and assigned a GAF score of 45. Tr. 296.

A month later, right after intake at the Providence Center but before Plaintiff had begun
regular appointments with Dr. Cermik and Mr. Deffely, on May 4, 2011, state agency
psychologist, Dr. J. Stephen Clifford, reviewed Plaintiff's medical records and opined regarding
his residual functional capacity ("RFC").[6] Tr. 85-88. In forming his opinion, Dr. Clifford
considered only the prison records and Dr. Parsons's consultative examination report prepared
shortly after Plaintiff was released. Tr. 84. He apparently was unaware of Plaintiff's psychiatric
hospitalization in March 2011 due to auditory hallucinations, suicidal ideation, panic attacks and
self-isolation, among other symptoms, when his GAF was assessed as 35. See Tr. 305-06.
Although Dr. Clifford noted Plaintiff's diagnoses of anxiety and affective disorder, he concluded
that Plaintiff has no restriction of activities of daily living, only mild difficulty with social
functioning and only moderate difficulty with concentration, persistence or pace. In his RFC
opinion, he opined that Plaintiff can sustain attention and concentration for simple tasks, can
accept direction from supervisors, can cooperate with co-workers and tolerate the general public;
he found no significant limitations on Plaintiff's ability to work in coordination with or in
proximity to others without being distracted. Tr. 86-88. Dr. Clifford did another file review on
July 8, 2011; apparently unaware of Plaintiff's recently initiated treatment at the Providence
Center and still unaware of the March 2011 hospitalization, he noted that the only new record
was the function report completed by Plaintiff and affirmed his opinion from May 4, 2011. Tr.
84. The next day – July 9, 2011 – Plaintiff's application was denied initially. Tr. 80.

---

[6] Residual functional capacity is "the most you can still do despite your limitations," taking into account "[y]our
impairment(s), and any related symptoms, such as pain, [that] may cause physical and mental limitations that affect
what you can do in a work setting." 20 C.F.R. § 404.1545(a)(1).

The rest of the state agency mental health opinion evidence appears to rely heavily on these opinions from Dr. Clifford.  See Tr. 323-26 (Dr. Rucker's opinion of July 21, 2011, agrees with Dr. Clifford).  Notably, agency psychologist Dr. Clifford Gordon, who prepared his opinion on November 8, 2011, made no reference to the March 2011 hospitalization or the by-then extensive treatment records from the Providence Center; rather he copied – verbatim – Dr. Clifford's "PRT – Additional Explanation" from May 2011.  Compare Tr. 107-08, with Tr. 86. The only difference between Dr. Clifford's opinion and that of Dr. Gordon is the latter's conclusion that Plaintiff is moderately restricted in activities of daily living and social functioning.  Tr. 109-10.  Shortly after Dr. Gordon's assessment, on November 10, 2011, Plaintiff's application was denied on reconsideration.  Tr. 135.

### 2.    Treating Opinions

Between September 2011 and October 2012, both Dr. Cermik and Mr. Deffely completed opinion forms in connection with Plaintiff's application, Dr. Cermik a total of three and Mr. Deffely a total of two.

In October 2011, after a six-month treating relationship, Dr. Cermik opined that Plaintiff's prognosis is fair, as long as he continues compliance with treatment, and that his diagnoses include major depressive disorder, panic disorder and personality disorder NOS.[7]  Tr. 342-43.  He noted that Plaintiff is moderately limited in his ability even to do simple work or make simple decisions, but that he is markedly limited in his ability to sustain attention and concentration, to interact with others, to work at a consistent pace and to respond to work-place changes.  Tr. 342-44.  Dr. Cermik's January 2012 opinion is similar: he opined to severe limits affecting Plaintiff's ability to relate to others or respond to supervision, his daily living activities

---

[7] In Dr. Cermik's contemporaneous 2011 treatment notes, this diagnosis is recorded as "R/O [Rule Out] Personality Disorder NOS."  See, e.g., Tr. 347.  In August 2012, Dr. Cermik changed his treating diagnosis to "Personality Disorder NOS with borderline features."  See Tr. 494.

and his interests, as well as moderately severe limits on his ability to respond to work pressures and coworkers. Tr. 409-10. Dr. Cermik's final opinion, rendered on October 1, 2012, after a year and a half of continuous treatment, is essentially the same – it records marked or severe limits in the ability to understand detailed instructions, to sustain attention and concentration, to engage in any social interaction (including working in proximity to others or interacting with the general public), to respond to customary work pressures, to complete a normal workday/week without psychologically based interruptions, to respond to work-place changes, or to engage in daily activities. Tr. 505-06, 508-09. Dr. Cermik summarized his conclusions: "[we've] never seen him doing well." Tr. 509.

Mr. Deffely's first opinion was prepared on September 13, 2011, after almost four months of continuous treatment. He opined to severe limitations in Plaintiff's ability to relate to others or respond to supervision or co-workers, to understand, remember or carry out instructions, or to respond to customary work pressures. Tr. 340-41. Formed a year later, on September 14, 2012, his second opinion is consistent, noting marked and moderately severe limitations in Plaintiff's ability to understand and remember, to sustain concentration and persistence, to engage in social interaction and to respond to customary work pressures. Tr. 498-502. Like Dr. Cermik's opinion, Mr. Deffely's assessment concludes that Plaintiff would miss at least three days from work a month due to his mental impairments. Tr. 503.

## II.  Travel of the Case

On January 6, 2011, Plaintiff applied for DIB and SSI, claiming he had become disabled in June 2008 as a result of high cholesterol, high blood pressure, depression, anxiety and PTSD. Tr. 80, 90, 210. After Plaintiff's applications were denied initially on July 9, 2011, and on reconsideration on November 10, 2011, Tr. 128, 135, Plaintiff sought a hearing before an ALJ,

which was held on November 5, 2012.  Tr. 35, 141.  At the hearing, the ALJ heard from a

vocational expert and Plaintiff.  Tr. 35-79.  On November 29, 2012, the ALJ issued a decision

that found Plaintiff not disabled under the Act.  Tr. 18-29.  Plaintiff sought review by the

Appeals Council, which denied his request on November 19, 2013, making the ALJ's decision

final.  Tr. 1-3, 14.  Plaintiff timely filed this action.

## III.    The ALJ's Hearing and Decision

At the hearing, Plaintiff testified that he lives with his mother.  Tr. 42.  He explained that,

although he got certifications for carpentry and writing while in prison, he did not learn much

and took them only so that he could qualify for "good time" credit.  Tr. 45-48.  When asked why

he cannot work, Plaintiff testified that his depression and anxiety – "what I go through, what I

listen to, what I hear" – makes it difficult to be around people and causes him to feel suicidal.

Tr. 52.  He avoids contact with everyone, including his mother and daughter, who lives with her

mother and visits on weekends.  Tr. 53-54.  On a typical day, he wakes up at 1:00 p.m. but stays

in bed, ruminating on sad memories and keeping the television on so his mother does not bother

him.  Tr. 68-69.  Although his therapist has suggested that he should continue reading as he did

in prison, he is not able to do so.  Tr. 72-73.  He has no friends since he last went to prison.

While he went to church twice a month for a while, he stopped because it caused anxiety attacks;

he has never attended bible study.  Tr. 57-60.  He affirmed that he has difficulty concentrating

and remembering, including his therapist's instructions.  Tr. 61-62.

The vocational expert confirmed that Plaintiff's past work is medium and unskilled and

was performed at the heavy level of exertion.  Tr. 75.  The ALJ asked the vocational expert to

consider a hypothetical individual of the claimant's age, education and work experience with the

following limitations:

> [N]o exertional limitations, but is limited to understanding, remembering and carrying out simple, routine, repetitive tasks with breaks every two hours and is further limited to no interaction with the public and to occasional work-related, nonpersonal, nonsocial interactions with co-workers and supervisors involving no more than a brief exchange of information or handoff of product.

Tr. 76. The expert testified that such a hypothetical individual could perform Plaintiff's past work as a laborer, but that, if such an individual were unable to respond appropriately to supervisors or were to miss two days a month on a consistent basis, there would be no work. Tr. 76-78. The vocational expert also opined that, if the hypothetical individual were off task for one unscheduled hour during the workday, he would be unemployable. Tr. 78.

At Step One of the sequential evaluation process, the ALJ found that Plaintiff had not engaged in substantial gainful activity since June 1, 2008, his alleged onset date. Tr. 21. At Step Two, the ALJ found severe impairments of depressive disorder, anxiety disorder, panic disorder and PTSD; his decision makes no mention of personality disorder. Tr. 21. At Step Three, largely in reliance on a cherry-picked potpourri of Plaintiff's activities such as "exercise at a gym," attendance at "religious services," "bible study," and visits to "agencies to find subsidized housing," the ALJ found that Plaintiff's impairments caused no more than moderate difficulties in activities of daily living, social interaction and with concentration, persistence and pace, and therefore did not meet or equal any listed impairments. Tr. 21-22.

At Step Four, the ALJ first found that, through the date last insured:

> the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant is limited to understanding, remembering, and carrying out simple, routine, repetitive tasks, with breaks every two hours; to no interaction with the general public; and to occasional work-related, non-personal, non-social interaction with co-workers and supervisors involving no more than a brief exchange of information or hand-off of product.

Tr. 22.  Although it aligns with the RFC opinion prepared by Dr. Gordon, the ALJ's decision states that he based this RFC on a survey of the evidence and "consider[ation of] the opinion evidence," without reference to having given weight to any specific opinion.  Tr. 22-23.  Relying again on Plaintiff's activities, including the "in-shape" program at the Providence Center, church, bible study and receipt of financial aid to go back to school, as well as the substance abuse treatment note that he is "stable," the ALJ found that Plaintiff's testimony regarding the intensity, persistence and limiting effects of his symptoms lacked credibility.  Tr. 24-26.  The ALJ rejected Dr. Cermik's three opinions, finding that they were not based on objective factors and are inconsistent with the evidence.  Tr. 27.  As specific reasons for rejecting them, the ALJ reprised the litany of activities and found that Dr. Cermik was unaware of them, particularly attendance at the "in-shape" program, receipt of financial aid for school, attendance at a cooking class and the search for subsidized housing.  Tr. 27.  Finding Mr. Deffely's opinions inconsistent with the treatment record and Plaintiff's activities, the ALJ also afforded them no significant evidentiary weight.  Tr. 26-27.

In reliance on this RFC, the ALJ concluded Plaintiff remained able to do his past work as a laborer.  Tr. 27-28.  Alternatively, at Step Five, the ALJ determined that Plaintiff could also do a significant number of other jobs in the national economy (including hand packager and price marker), based on the vocational expert's testimony.  Tr. 28; see Tr. 75-77.  Accordingly, the ALJ found Plaintiff not disabled and denied his applications.  Tr. 28-29.

**IV.   Issues Presented**

Plaintiff contends that the ALJ violated 20 C.F.R. § 404.1527 in failing to set forth good reasons for his rejection of Dr. Cermik's opinion, that he erred in failing to include the diagnosis

of Personality Disorder, NOS, at Step Two or to consider the effect of Personality Disorder on Plaintiff's ability to work and that he erred in failing to obtain medical expert testimony.

## V.     **Standard of Review**

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla – that is, the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (per curiam); Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981); Brown v. Apfel, 71 F. Supp. 2d 28, 30 (D.R.I. 1999). Once the Court concludes that the decision is supported by substantial evidence, the Commissioner must be affirmed, even if the Court would have reached a contrary result as finder of fact. Rodriguez Pagan v. Sec'y of Health & Human Servs., 819 F.2d 1, 3 (1st Cir. 1987); see also Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991); Lizotte v. Sec'y of Health & Human Servs., 654 F.2d 127, 128 (1st Cir. 1981).

The determination of substantiality is based upon an evaluation of the record as a whole. Brown, 71 F. Supp. 2d at 30; see also Frustaglia v. Sec'y of Health & Human Servs., 829 F.2d 192, 195 (1st Cir. 1987); Parker v. Bowen, 793 F.2d 1177, 1180 (11th Cir. 1986) (court also must consider evidence detracting from evidence on which Commissioner relied). Thus, the Court's role in reviewing the Commissioner's decision is limited. Brown, 71 F. Supp. 2d at 30. The Court does not reinterpret the evidence or otherwise substitute its own judgment for that of the Commissioner. Id. at 30-31 (citing Colon v. Sec'y of Health & Human Servs., 877 F.2d 148, 153 (1st Cir. 1989)). "[T]he resolution of conflicts in the evidence is for the Commissioner, not the courts." Id. at 31 (citing Richardson v. Perales, 402 U.S. 389, 399 (1971)). A claimant's

complaints alone cannot provide a basis for entitlement when they are not supported by medical evidence.  See Avery v. Sec'y of Health & Human Servs., 797 F.2d 19, 20-21 (1st Cir. 1986); 20 C.F.R. § 404.1529(a).

The Court must reverse the ALJ's decision on plenary review, if the ALJ applies incorrect law, or if the ALJ fails to provide the Court with sufficient reasoning to determine that the law was applied properly.  Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam); accord Cornelius v. Sullivan, 936 F.2d 1143, 1145-46 (11th Cir. 1991).  Remand is unnecessary where all of the essential evidence was before the Appeals Council when it denied review, and the evidence establishes without any doubt that the claimant was disabled.  Seavey v. Barnhart, 276 F.3d 1, 11 (1st Cir. 2001) (citing Mowery v. Heckler, 771 F.2d 966, 973 (6th Cir. 1985)).

The Court may remand a case to the Commissioner for a rehearing under Sentence Four of 42 U.S.C. § 405(g); under Sentence Six of 42 U.S.C. § 405(g); or under both sentences. Jackson v. Chater, 99 F.3d 1086, 1097-98 (11th Cir. 1996).

To remand under Sentence Four, the Court must either find that the Commissioner's decision is not supported by substantial evidence, or that the Commissioner incorrectly applied the law relevant to the disability claim.  Seavey, 276 F.3d at 9; accord Brenem v. Harris, 621 F.2d 688, 690 (5th Cir. 1980) (remand appropriate where record was insufficient to affirm, but also was insufficient for district court to find claimant disabled).  Where the Court cannot discern the basis for the Commissioner's decision, a Sentence Four remand may be appropriate to allow an explanation of the basis for the decision.  Freeman v. Barnhart, 274 F.3d 606, 609-10 (1st Cir. 2001).  On remand under Sentence Four, the ALJ should review the case on a complete record, including any new material evidence.  Diorio v. Heckler, 721 F.2d 726, 729 (11th Cir. 1983) (necessary for ALJ on remand to consider psychiatric report tendered to Appeals Council).  After

a Sentence Four remand, the Court enters a final and appealable judgment immediately, and thus loses jurisdiction.  Freeman, 274 F.3d at 610.

In contrast, Sentence Six of 42 U.S.C. § 405(g) provides:

The court . . . may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding.

42 U.S.C. § 405(g).  To remand under Sentence Six, the claimant must establish: (1) that there is new, non-cumulative evidence; (2) that the evidence is material, relevant and probative so that there is a reasonable possibility that it would change the administrative result; and (3) there is good cause for failure to submit the evidence at the administrative level.  See Evangelista v. Sec'y of Health & Human Servs., 826 F.2d 136, 139-43 (1st Cir. 1987).

With a Sentence Six remand, the parties must return to the Court after remand to file modified findings of fact.  Jackson, 99 F.3d at 1095 (citing Melkonyan v. Sullivan, 501 U.S. 89, 98 (1991)).  The Court retains jurisdiction pending remand and does not enter a final judgment until after the completion of remand proceedings.  Id.

## VI.    Disability Determination

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. §§ 416(I), 423(d)(1); 20 C.F.R. § 404.1505.  The impairment must be severe, making the claimant unable to do previous work, or any other substantial gainful activity which exists in the national economy.  42 U.S.C. § 423(d)(2); 20 C.F.R. § 404.1505-1511.

### A.    Treating Physicians and Other Sources

Substantial weight should be given to the opinion, diagnosis and medical evidence of a treating physician unless there are good reasons to do otherwise. See Rohrberg v. Apfel, 26 F. Supp. 2d 303, 311 (D. Mass. 1998); 20 C.F.R. § 404.1527(c). If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight. Konuch v. Astrue, No. 11-193L, 2012 WL 5032667, at *4-5 (D.R.I. Sept. 13, 2012); 20 C.F.R. § 404.1527(c)(2). The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory. See Keating v. Sec'y of Health & Human Servs., 848 F.2d 271, 275-76 (1st Cir. 1988). The ALJ's decision must articulate the weight given, providing "good reasons" for the determination. See Sargent v. Astrue, No. CA 11–220 ML, 2012 WL 5413132, at *7-8, 11-12 (D.R.I. Sept. 20, 2012) (where ALJ failed to point to evidence to support weight accorded treating source opinion, court will not speculate and try to glean from the record; remand so that ALJ can explicitly set forth findings).

Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments. See Wheeler v. Heckler, 784 F.2d 1073, 1075 (11th Cir.1986). When a treating physician's opinion does not warrant controlling weight, the ALJ must nevertheless weigh the medical opinion based on the (1) length of the treatment relationship and the frequency of examination; (2) nature and extent of the treatment relationship; (3) medical evidence supporting the opinion; (4) consistency with the record as a whole; (5) specialization in the medical conditions at issue; and (6) other factors which tend to support or contradict the

opinion. 20 C.F.R § 404.1527(c). However, a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion. Id. § 404.1527(c)(2).

A treating source who is not a licensed physician or psychologist[8] is not an "acceptable medical source." 20 C.F.R. § 404.1513; SSR 06-03p, 2006 WL 2263437, at *2 (Aug. 9, 2006). Only an acceptable medical source may provide a medical opinion entitled to controlling weight to establish the existence of a medically determinable impairment. SSR 06-03p, 2006 WL 2263437, at *2. An "other source," such as a nurse practitioner or licensed clinical social worker, is not an "acceptable medical source," and cannot establish the existence of a medically determinable impairment, though such a source may provide insight into the severity of an impairment, including its impact on the individual's ability to function. Id. at *2-3. In general, an opinion from an "other source" is not entitled to the same deference as an opinion from a treating physician or psychologist. Id. at *5. Nevertheless, the opinions of medical sources who are not "acceptable medical sources" are important and should be evaluated on key issues such as severity and functional effects, along with other relevant evidence in the file. Id. at *4.

The ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled. However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability. 20 C.F.R. § 404.1527(d). The ALJ is not required to give any special significance to the status of a physician as treating or non-treating in weighing an opinion on whether the claimant meets a listed impairment, a claimant's RFC, (see 20 C.F.R. § 404.1545-1546), or the application of vocational factors because that ultimate determination is the province of the

---

[8] The regulations recognize other categories of providers as acceptable medical sources for certain impairments; for example, a licensed optometrist is acceptable for measurement of visual acuity and visual fields. SSR 06-03p, 2006 WL 2263437, at *1.

Commissioner.  20 C.F.R. § 404.1527(d); <u>see also</u> <u>Dudley v. Sec'y of Health & Human Servs.</u>, 816 F.2d 792, 794 (1st Cir. 1987) (per curiam).

### B.    Developing the Record

Social Security proceedings are "inquisitorial rather than adversarial."  <u>Sims v. Apfel</u>, 530 U.S. 103, 110-11 (2000); <u>Miranda v. Sec'y of Health, Educ. & Welfare</u>, 514 F.2d 996, 998 (1st Cir. 1975) (social security proceedings "are not strictly adversarial").  The ALJ and the Appeals Council each have the duty to investigate the facts and develop the arguments both for and against granting benefits.  <u>Sims</u>, 530 U.S. at 110-11.  The obligation to fully and fairly develop the record exists if a claimant has waived the right to retained counsel, and even if the claimant is represented by counsel.  <u>Evangelista</u>, 826 F.2d at 142.  Courts in this Circuit have made few bones about the responsibility that the Commissioner bears for adequate development of the record.  <u>Id.</u>; <u>see</u> <u>Deblois v. Sec'y of Health & Human Servs.</u>, 686 F.2d 76, 80-81 (1st Cir. 1982); <u>Currier v. Sec'y of Health, Educ. & Welfare</u>, 612 F.2d 594, 598 (1st Cir. 1980).

### C.    The Five-Step Evaluation

The ALJ must follow five steps in evaluating a claim of disability.  <u>See</u> 20 C.F.R. § 404.1520.  First, if a claimant is working at a substantial gainful activity, the claimant is not disabled.  20 C.F.R. § 404.1520(b).  Second, if a claimant does not have any impairment or combination of impairments that significantly limit physical or mental ability to do basic work activities, then the claimant does not have a severe impairment and is not disabled.  <u>Id.</u> § 404.1520(c).  Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Appendix 1, the claimant is disabled.  <u>Id.</u> § 404.1520(d).  Fourth, if a claimant's impairments do not prevent doing past relevant work, the claimant is not disabled.  <u>Id.</u> § 404.1520(e)-(f).  Fifth, if a claimant's impairments (considering RFC, age, education and past

work) prevent doing other work that exists in the local or national economy, a finding of disabled is warranted. Id. § 404.1520(g). Significantly, the claimant bears the burden of proof at Steps One through Four, but the Commissioner bears the burden at Step Five. Wells v. Barnhart, 267 F. Supp. 2d 138, 144 (D. Mass. 2003) (five step process applies to both DIB and SSI claims).

In determining whether a claimant's physical and mental impairments are sufficiently severe, the ALJ must consider the combined effect of all of the claimant's impairments and must consider any medically severe combination of impairments throughout the disability determination process. 42 U.S.C. § 423(d)(2)(B). Accordingly, the ALJ must make specific and well-articulated findings as to the effect of a combination of impairments when determining whether an individual is disabled. Davis v. Shalala, 985 F.2d 528, 534 (11th Cir. 1993). The claimant must prove the existence of a disability on or before the last day of insured status for the purposes of disability benefits. Deblois, 686 F.2d at 79; 42 U.S.C. §§ 416(i)(3), 423(a), 423(c). If a claimant becomes disabled after loss of insured status, the claim for disability benefits must be denied despite disability. Cruz Rivera v. Sec'y of Health & Human Servs., 818 F.2d 96, 97 (1st Cir. 1986).

D.    **Evaluation of Mental Illness Claims**

The evaluation of a claim of disability based on mental illness requires use of a psychiatric review technique that assesses impairment in four work-related functions: (1) activities of daily living; (2) social functioning; (3) concentration, persistence or pace; and (4) episodes of decompensation. 20 C.F.R. § 404.1520a(c)(3). The review technique is used to rate the severity of mental impairments at Steps Two and Three of the sequential evaluation process, and also serves as the backdrop for the more detailed mental RFC assessment at Step Four. See, e.g., Wells v. Colvin, 727 F.3d 1061, 1069 (10th Cir. 2013); SSR 96-8p, 1996 WL 371184 (July

2, 1996).  The ALJ must incorporate pertinent findings and conclusions based on the technique into his decision and must include a specific finding as to the degree of limitation in each of the four functional areas.  20 C.F.R. § 404.1520a(e)(4); Carolyn Kubitschek & Jon Dubin, <u>Social Security Disability Law & Procedure in Federal Court</u> § 5:38 (2014).

## VII.  <u>Application and Analysis</u>

### A.  **Rejection of Treating Source Opinion Evidence**

The ALJ blundered badly in rejecting the three opinions of Plaintiff's long-term treating psychiatrist, Dr. Cermik.  <u>See</u> 20 C.F.R. § 404.1527(c)(2).  The law is plain: such opinions are entitled to controlling weight as long as they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence in [the] case record."  <u>Id.</u>  Equally plain is the ALJ's obligation either to afford them controlling weight or to articulate the weight given and to provide "good reasons" for the determination.  <u>Sargent</u>, 2012 WL 5413132, at *7-8.  When the ALJ fails to give sufficient reasons for the decision to reject a treating psychiatrist, his opinion is not supported by substantial evidence, and a remand is required.  <u>Polanco-Quinones v. Astrue</u>, 477 F. App'x 745, 748 (1st Cir. 2012) (per curiam).

The ALJ's first articulated reason for disregarding Dr. Cermik's opinions is his conclusory statement that they are "not supported by the evidence as a whole."  Tr. 27.  The decision does not elucidate what is the inconsistent evidence.  This serious deficiency leaves the Court to hunt through the record to find evidence contrary to Dr. Cermik's well-supported conclusions.  <u>See</u> <u>Rathke v. Astrue</u>, No. 09-4045-RDR, 2010 WL 1530714, at *5 (D. Kan. Apr. 14, 2010).

The search for inconsistency begins with the treating records. However, except for the substance abuse records, which relate to Plaintiff's success at sustaining sobriety and not to treatment of his relevant mental health impairments, all of the material treating notes from the prison, Rhode Island Hospital, SSTAR and the Providence Center align with Dr. Cermik's opinions. The inconsistent evidence also cannot be the report of agency examining psychologist Dr. Parsons; Dr. Cermik's opinions are remarkably consistent with the clinical observations in Dr. Parsons's evaluation of February 22, 2011. Tr. 288. Both performed mental status examinations concluding that Plaintiff made poor eye contact, used slow, non-spontaneous speech, presented with a mood that was dysphoric, depressed and anxious; both diagnosed major depressive disorder and observed impaired attention and concentration; both concluded that he had no sense of humor and was sad and withdrawn; both opined to a fair prognosis and a GAF score of 45. Compare Tr. 293-96, with Tr. 494.

The only remaining material record[9] is the opinion of Dr. Gordon, the agency psychologist whose file review resulted in the finding that Plaintiff's limitations are no more than moderate. If this is what the ALJ meant, the first flaw is that he did not mention Dr. Gordon's assessment anywhere in his decision, and therefore does not explain the weight he gave it, despite the requirement that he must do so. See Polanco-Quinones, 477 F. App'x at 748 (citing 20 C.F.R. § 404.1527(e)(2)(ii)); Mohammed v. Astrue, No. 1:10-CV-1518-JFK, 2011 WL 2621362, at *8 (N.D. Ga. July 1, 2011). Even if this Court assumes that the ALJ relied on Dr. Gordon's opinion, the question remains whether it constitutes substantial inconsistent evidence,

---

[9] The ALJ apparently did not consider the opinions of the earlier agency file reviewers, Dr. Clifford and Dr. Rucker. He does not say what weight, if any, he gave them and his decision appears to have properly given them short shrift in that his RFC omits the functional abilities to which they opined. As opinions that were prepared before most of the relevant treating records came into existence and were based largely on Plaintiff's functioning while incarcerated, it would be error requiring remand if he did rely on them. See Padilla v. Barnhart, 186 F. App'x 19, 22-23 (1st Cir. 2006) (per curiam); Cruz v. Astrue, No. CA 11-638M, 2013 WL 795063, at *13 (D.R.I. Feb. 12, 2013).

which in turn depends on whether it rests on a reasonable read of the entirety of the relevant medical evidence. 20 C.F.R. § 404.1527(e); Polanco-Quinones, 477 F. App'x at 748.

It falls woefully short. Dr. Gordon's assessment is not based on – and is significantly inconsistent with – the substantial medical record developed both before and after it was prepared. Hall v. Colvin, 18 F. Supp. 3d 144, 153-54 (D.R.I. 2014) (opinion based on significantly incomplete record is not entitled to any significant weight) (citing Alcantara v. Astrue, 257 F. App'x 333, 334 (1st Cir. 2007)). Not only was it prepared before much of Plaintiff's extensive treatment with Dr. Cermik and Mr. Deffely, before the treating diagnosis of Personality Disorder NOS, and before the stroke that probably adversely affected Plaintiff's mood, but it also fails to mention any of the extant treatment records (from the Providence Center, Rhode Island Hospital and SSTAR), suggesting that Dr. Gordon simply did not review any of them.[10] This hypothesis is affirmed by Dr. Gordon's textual explanation of his work, which is copied verbatim from the far earlier assessment done by Dr. Clifford. Tr. 107. Because of these deficits, the opinion fails to mention "all of claimant's alleged impairments and [state] medical conclusions as to each," and thus "suggests that [he] did [not] review the medical file with some care." Berrios Lopez v. Sec'y of Health & Human Servs., 951 F.2d 427, 431 (1st Cir. 1991) (per curiam); cf. Quintana v. Comm'r of Soc. Sec., 110 F. App'x 142, 144 (1st Cir. 2004) (per curiam) (reliance on opinions of non-examining consultants appropriate because they "reviewed the reports of examining and treating doctors . . . and supported their conclusions with reference to medical findings"). In short, Dr. Gordon's cursory file review did not result in an

---

[10] The Commissioner argues that the Court may infer that Dr. Gordon must have considered the diagnosis of "r/o antisocial personality d/o" because it is in the April 21, 2011 Initial Assessment prepared by the Providence Center that is mentioned in the "Findings of Fact and Analysis of Evidence" entered in the administrative record prior to Dr. Gordon's assessment. Tr. 106 (referring to Tr. 408). This argument holds no water – Dr. Gordon's opinion (copied from Dr. Clifford) refers only to the prison records and to Dr. Parsons's report and makes no mention of any record from the Providence Center. See Tr. 107.

opinion that constitutes "substantial evidence" worthy of consideration.  Eshelman v. Astrue, No. 06-cv-107-B-W, 2007 WL 2021909, at *3 (D. Me. July 11, 2007) (non-examining opinion is not substantial evidence when completed without consideration of material evidence).  Accordingly, I find that Dr. Cermik's opinions are consistent with and well supported by the substantial evidence and the ALJ's contrary conclusion does not amount to a "good reason" to reject them.

The ALJ's second reason for rejecting Dr. Cermik's opinions is his finding that Dr. Cermik was not aware of various activities that the ALJ concluded are inconsistent with the functional limitations in the opinions.  The ALJ lists these activities:[11] Plaintiff "joined an 'in shape program,' that he was attending a cooking class . . . ; he had received financial aid to go back to school . . . ; and he had been visiting various government agencies to find subsidized housing."  Tr. 27.  Review of the record reveals that the foundation for this critique is largely unfounded – the treating notes demonstrate that Dr. Cermik and Mr. Deffely were aware of Plaintiff's activities, including his struggles because of his impairments.

The ALJ is simply wrong in concluding that Plaintiff's attempts to attend the "in-shape" program and to take courses at a community college are inconsistent activities of which Dr. Cermik was unaware.  Dr. Cermik knew about both; his treating notes reference Plaintiff's failure at both due to severe panic attacks and lack of motivation.  Tr. 494.  Mr. Deffely's treating notes confirm that the attempt to attend "in-shape" resulted in panic attacks so severe that Dr. Cermik was alerted.  Tr.  468.  The ALJ's conclusion that Dr. Cermik was not aware that Plaintiff was attending cooking class is based on a reference in a substance abuse treatment

---

[11] It is a familiar list – the ALJ also relied on them in finding that Plaintiff's impairments do not meet a Listing and in developing his RFC opinion.  Tr. 21-22, 26.

note,[12] Tr. 453, but there is nothing else suggesting Plaintiff ever attended a cooking class. The ALJ's final point – that Dr. Cermik was unaware that Plaintiff had been to government agencies to look for subsidized housing – is also groundless. The ALJ derived this conclusion from references in the record to Plaintiff's need to "find subsidized housing" because he had been told to "move out of moms house." Tr. 466. However, far from being unknown to his providers at the Providence Center, or inconsistent with the functional limits to which they opined, the record confirms that approaching government agencies about housing was a psychological challenge for Plaintiff that he addressed in therapy with Mr. Deffely. Tr. 468 ("[s]upported his working with Riverwood about housing due to recent eviction notice at Mother's apartment").

The ALJ's last reason for rejecting Dr. Cermik's opinion – because "there was little or no basis for concluding from Dr. Cermik's forms that he based his conclusions . . . on objective factors as opposed to the claimant's reported symptoms" – also is without foundation. Tr. 27. During each medical appointment during 2011 and 2012, Dr. Cermik administered a mental status examination and did a clinical interview, making observations of Plaintiff's "psychological abnormalities." Dr. Cermik also worked closely with Mr. Deffely, whose direct observations of Plaintiff's attention and concentration deficits are so dramatically described in his notes. See, e.g., Tr. 364-66, 374, 449. Under the regulations, in the mental health arena, such findings and observations constitute objective psychiatric signs appropriate to be relied on as support for a medical opinion – "medically demonstrable phenomena that indicate specific psychological abnormalities" and "can be medically described and evaluated." 20 C.F.R. § 404.1528(b); see

---

[12] The substance abuse treatment provided by Ms. Guzman amounted to little more than reinforcement of Plaintiff's continuing sobriety. Ms. Guzman made several notes reflecting either that she was urging Plaintiff to engage in activities or that Plaintiff was engaging in activities that are referenced nowhere else in the record. The cooking class is one of these.

Polanco-Quinones, 477 F. App'x at 747. I find that Dr. Cermik's opinions are well grounded in objective findings and observations; the ALJ's contrary conclusion is error.[13] Id.

There is no need to go further. As a psychiatrist, Dr. Cermik is a qualified and competent treating source; his three opinions are based on an extended treating relationship, all three are consistent both with his treating notes and with the other substantial evidence in the case record, and all three are well supported by "medically acceptable clinical . . . techniques." See SSR 96-2p, 1996 WL 374188, at *1. None of the ALJ's stated reasons to reject them is supportable. This is enough to merit remand.[14] Soto-Cedeño, 380 F. App'x at 4 (when ALJ fails to give supportable reasons for rejecting treating opinion, remand ordered); Ferguson v. Colvin, No. CA 14-151-M-PAS, 2014 WL 6908859, at *6-7 (D.R.I. Dec. 9, 2014) (remand to give appropriate weight to treating physician).

### B.      Failure to Consider Personality Disorder at Steps Two, Three and Four

A personality disorder is a mental impairment defined as "an enduring pattern of inner experience and behavior that deviates markedly from the expectations of the individual's culture, is pervasive and inflexible, has an onset in adolescence or early adulthood, is stable over time and leads to distress or impairment." DSM-V at 645. The regulations establish Listing criteria for "personality disorder," which, if met, require the determination of disability. 20 C.F.R. Part 404, Subpart P, Appendix 1 (12.08 Personality Disorders). The potential or "rule out" diagnosis of personality disorder appears repeatedly in Plaintiff's medical history. See, e.g., Tr. 347, 408. It is definitively diagnosed for the first time in Dr. Cermik's opinion of October 13, 2011; it

---

[13] This error appears to have been caused by a misinterpretation of Dr. Cermik's comment on the Substance Abuse Materiality Questionnaire that he made "no objective findings" and that "urine screens have been consistently negative." Tr. 511. With a record replete with objective findings, it is clear that this comment must be read in context and refers to the lack of objective findings of active substance abuse.

[14] While the parties do not emphasize the ALJ's decision to afford Mr. Deffely's opinions "no significant evidentiary weight," I also find that the ALJ's rejection of them is based on the same erroneous conclusion that the limitations to which they opine are not supported by the record. Tr. 26-27.

appears as a definitive diagnosis in the treating notes for the first time in August 2012, when Dr. Cermik changed his treating diagnosis from "rule out" to "Personality Disorder NOS with borderline features." Tr. 343, 494. This delay in transitioning from "rule out" to definitive diagnosis is consistent with the protracted observation necessary to diagnose an impairment whose criteria include an abnormal pattern that is "stable over time." DSM-V at 645.

The ALJ completely ignores this serious diagnosis. His list of Step Two impairments omits it and his discussion of potentially severe impairments makes no reference to it. Tr. 21. As a result, it was not considered at all in the analysis whether Plaintiff meets a Listing at Step Three nor was it considered in the analysis of Plaintiff's RFC. Tr. 21-27. That it was entirely overlooked is reflected in the hypothetical posed to the vocational expert that mirrors Dr. Gordon's RFC assessment (despite making no reference to it), which apparently was prepared without access to Dr. Cermik's diagnosis of personality disorder.[15]

Whether the focus is on Step Two, Step Three or Step Four, the ALJ's failure even to consider the personality disorder diagnosis is error. Evans v. Astrue, No. CA 11-146S, 2012 WL 4482366, at *4 (D.R.I. Aug. 23, 2012) (not error to omit personality disorder at Step Two where it was considered and finding that it was not severe is well supported in record); Pafume v. Astrue, No. CA 11-310A, 2012 WL 2149919, at *10-11 (D.R.I. June 12, 2012) (no error to omit personality disorder at Step Two where ALJ considered it but found claimant had not presented evidence of the diagnosis); see Evans v. Colvin, No. 2:12-CV-235-JAW, 2013 WL 2145637, at *4, *9 (D. Me. Apr. 26, 2013) (where ALJ included personality disorder, among others, as severe at Step Two, it was considered at Step Three and is incorporated into the RFC analysis). The law is pellucid that the ALJ cannot just ignore a diagnosis from a qualified treating source; for an

---

[15] Dr. Gordon reviewed the file on November 8, 2011, while Dr. Cermik's first iteration of the definitive diagnosis of personality disorder is in his opinion of October 13, 2011. It is unclear whether the Cermik opinion had made its way into the record by November 8, 2011. See n.8, *supra*. Dr. Gordon makes no reference to it.

impairment as to which a claimant has sustained his burden, the ALJ must make a finding on severity with reasons that are explained. Charpentier v. Colvin, No. CA 12-312 S, 2014 WL 575724, at *12 (D.R.I. Feb. 11, 2014). Plaintiff sustained his burden of presenting evidence that he had a "medically determinable" mental impairment that significantly limited his ability to do basic work by offering Dr. Cermik's October 13, 2011, opinion and August 2012 treating note. At a minimum, this evidence triggered the ALJ's duty to consider whether it constituted a "severe" impairment at Step Two and, "severe" or not, to consider it again at Step Four. See Slobuszewski v. Soc. Sec. Admin. Comm'r, No. 1:10-cv-00302-JAW, 2011 WL 2678954, at *7 (D. Me. June 7, 2011). His failure to do so requires remand.

### C. Medical Expert

Plaintiff contends that the ALJ should have considered whether to afford controlling weight to Dr. Cermik's opinions and whether the impairments described in them are equivalent in severity to any impairment in the Listings for affective disorders (12.04), anxiety-related disorders (12.06) or personality disorder (12.08). See 20 C.F.R. Part 404, Subpart P, Appendix 1. To do so, particularly with no indication in his decision that he afforded weight to any of the agency opinions, at a minimum, the ALJ should have obtained an opinion from a medical expert with the expertise essential to sift through the record references to activities that Dr. Cermik found consistent with disabling limitations but that the ALJ found inconsistent with a finding of disability. Hall, 18 F. Supp. 3d at 152 (when record is replete with evidence of potentially disabling impairments, but also has evidence supporting RFC, medical expert needed because determination beyond competence of ALJ as lay person). With no testimony from a medical expert and no indication that he afforded significant weight to any medical opinion, the ALJ effectively relied solely on his lay judgment to sift through Plaintiff's activities to evaluate

severity, to make the Listing determinations and to craft his RFC.  Such an opinion is not supported by substantial evidence.  Id. at 152; see Nguyen, 172 F.3d at 35 (ALJ may not ignore evidence, misapply law or judge matters entrusted to experts).  In this circumstance, the failure to call a medical expert is error requiring remand.

## VIII.  Conclusion

Based on the foregoing analysis, I recommend that Plaintiff's Motion to Reverse Without or, Alternatively, With a Remand for a Rehearing of the Commissioner's Final Decision (ECF No. 7) be GRANTED and the Defendant's Motion for an Order Affirming the Decision of the Commissioner (ECF No. 10) be DENIED, and that final judgment enter in favor of Plaintiff and the case be remanded for further administrative proceedings consistent with this opinion.

Any objection to this report and recommendation must be specific and must be served and filed with the Clerk of the Court within fourteen (14) days after its service on the objecting party.  See Fed. R. Civ. P. 72(b)(2); DRI LR Cv 72(d).  Failure to file specific objections in a timely manner constitutes waiver of the right to review by the district judge and the right to appeal the Court's decision.  See United States v. Lugo Guerrero, 524 F.3d 5, 14 (1st Cir. 2008); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 605 (1st Cir. 1980).


/s/ Patricia A. Sullivan
PATRICIA A. SULLIVAN
United States Magistrate Judge
January 29, 2015